# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

UNITED STATES OF AMERICA

-vs-                                                        Case No.  6:01-cr-134-Orl-31DAB

ANTONINO EUGENE LYONS
a/k/a Nino

_____

## MEMORANDUM OPINION

### I.      Preface

On March 14, 2002, Antonino "Nino" Lyons appeared before this Court for sentencing. He had been convicted by a jury of a number of serious crimes.  The most serious conviction was based almost entirely on testimony from convicted felons who claimed to have bought large quantities of cocaine from him, or sold large quantities of cocaine to him.  Under the sentencing scheme in effect at that time, Lyons faced a mandatory life sentence.

The sentencing did not go forward that day.  Instead, Lyons sought, and was granted, a continuance so that he could bring in new counsel.  That continuance proved to be a turning point. Over the ensuing months, the Court learned, bit by bit, that the government had failed to abide by its obligations under the Constitution and that the most damning testimony against Lyons had come from people who had been allowed, if not encouraged, to lie under oath.  Nearly three years after his arrest, Lyons was exonerated as to all the charges that had been brought against him.

Today, metaphorically at least, Lyons again stands before this Court. This time, however, he is a free man, seeking redress for the wrongs visited upon him by the overzealous prosecutors and DEA case agent who betrayed the powerful positions intrusted to them.

## II.    History of the Lyons Prosecution

According to the government-prepared Presentencing Investigation Report ("PSR"), at the time of his arrest in 2001 Lyons was a respected businessman and longtime resident of Brevard County. A former high school basketball star, he lived modestly with his wife (an elementary school principal) and two children in a lower middle-class neighborhood in Rockledge, Florida He had a college degree, no criminal record and did not consume alcohol or illegal drugs. He operated several businesses, including a clothing store and a night club. The only outward suggestions of affluence were two nice cars, though both were more than five years old: a 1993 Chevrolet Corvette and a 1995 Lexus. People in the community viewed him as a leader and a role model, especially for his work with programs for low-income children.

On August 23, 2001, Lyons was arrested and charged with a number of federal crimes.[1] He pleaded not guilty and fought the charges. He was represented by competent counsel who were zealous in their defense of Lyons. However, they were unable to overcome what turned out to be a

---

[1]Under the final indictment, the Second Superseding Indictment, Lyons was charged with conspiracy to possess and distribute crack cocaine and powder cocaine (Count One); possession of a firearm during the conspiracy alleged in the previous count (Count Two); attempted possession of crack cocaine and powder cocaine with intent to distribute (Count Three); possession of a firearm during the crime alleged in the previous count (Count Four); attempted carjacking (Count Five); carjacking (Count Six); trafficking in counterfeit goods (Counts Seven through Seventeen); and possession of counterfeit currency with the intent to defraud (Count Eighteen). (Doc. 37).

concerted campaign of prosecutorial abuse.[2]   On November 26, 2001, after a jury trial, Lyons was

convicted of several crimes – the most serious being Count One, the cocaine-trafficking  charge.[3]

The government's case on the drug charges was based entirely on the testimony of twenty-six

incarcerated felons who had allegedly purchased cocaine from Lyons or sold it to him before their

own arrests and convictions.[4]  Prominent within this group was David Mercer ("Mercer"), who

claimed to have purchased five kilograms of crack cocaine every two weeks, directly from Lyons,

for about three years, making him Lyons's largest customer.  Mercer, like all the other incarcerated

---

[2] The abuse of the Lyons family was not limited to the Defendant here.  As set forth in Judge Fawsett's order (Doc. 49 in Case No. 6:01-cr-35-PCF), the United States Secret Service picked up Nino's brother, Raymond, in January 2001 and questioned him for three hours about passing counterfeit currency.  He repeatedly requested an attorney, but the agents either ignored the requests or told him he did not need an attorney.  The agents pressured him to make a written statement implicating his brother, telling him that if he refused to do so, he would be going to jail that night, that the agents would insure that he did not receive bond, and that he would be in jail 100 days before he would get to see a lawyer.  When his sister learned of his arrest and contacted the station where Raymond was being interrogated, the agents lied to her about his status – saying he was cooperating voluntarily – and refused to let her speak with him.  When the attorney she had retained to represent Raymond appeared at the station, the agents again refused any contact with Raymond, despite his repeated requests for an attorney.  While this was going on, Raymond's truck was illegally searched. Raymond was not permitted to leave the interrogation until he signed a confession (at which point, as he was escorted into the lobby, he was surprised to encounter his attorney).

    The agents denied Raymond's description of the events of that night, but Judge Fawsett found that their testimony was not credible, describing it as "tightly constructed, seemingly rehearsed, and almost verbatim".  (Doc. 49 at 12 in Case No. 6:01-cr-35-PCF).  As a result, Raymond's motion to suppress the confession was granted, and the charges against him were dropped.

    [3]He was also convicted of one count of carjacking (Count Six) and nine counts of selling counterfeit goods (Counts Seven to Seventeen).  During the trial, the government dismissed Count Eighteen and the Court granted a judgment of acquittal as to Counts Two, Five and Seventeen. The jury returned a verdict of not guilty as to Counts Three and Four.

    [4]Unlike the typical drug case tried in federal court, the government in this case did not introduce any wiretap evidence, tape recordings, telephone records, evidence of undercover transactions, testimony from investigating officers, or physical evidence in support of the drug charges against Lyons.  (Doc. 272 at 3).

felons who testified against Lyons, claimed that the government had not promised him anything in exchange for his testimony.

In preparation for Lyons's scheduled sentencing in March 2002, a probation officer calculated Lyons's United States Sentencing Guideline ("USSG") score. Lyons's criminal history was so minor – traffic tickets and the like – that it was scored as a zero. However, because of the testimony that Lyons had been responsible for buying and selling more than 400 kilos of cocaine, his offense level score was 43.[5] Even with no criminal history, this offense level score resulted in a guideline sentence of life imprisonment. In March 2002 – *i.e.*, prior to the decision in *United States v. Booker*, 543 U.S. 220 (2005) – this "guideline" sentence was effectively mandatory.

Around the same time he filed his motion for a continuance of the sentencing, Lyons filed a motion challenging this Court's earlier denial of his motion for new trial. Lyons argued that the government had committed *Brady*[6] and *Giglio*[7] violations in connection with Mercer's testimony.[8] Lyons alleged that the government had failed to turn over exculpatory information, including

---

[5]It should go without saying that this is an enormous quantity of cocaine, with a street value in excess of $8 million. It is also worth noting that, in a particularly audacious display, the government sought to enhance Lyons's guideline sentence, arguing that *he* had lied on the stand when he denied the charges against him and contradicted the government's witnesses.

[6]In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that the Due Process Clause imposes an affirmative duty on prosecutors to disclose exculpatory evidence.

[7]In *Giglio v. United States*, 405 U.S. 150 (1972), the court held that the Due Process Clause requires prosecutors to correct material false testimony from witnesses against the accused.

[8]In its initial order denying Lyons's motion for a new trial, the Court observed that "the testimony of these accomplice witnesses is highly suspect." As described in more detail below, it turned out that the Court's suspicion was well founded. The *Brady* and *Giglio* violations, among other issues, were not limited to just Mercer's testimony.

reports and notes from interviews during which Mercer made statements at odds with his

subsequent trial testimony, and with earlier taped conversations that were used against Mercer in

his own trial.[9]  In addition to arguing that the reports and notes were not exculpatory, the

government's lead trial attorney, Assistant U.S. Attorney Bruce Hinshelwood, told the Court that

the government could not have turned the documents over because they were not in the

government's possession, and that the taped conversations involving Mercer and his alleged co-

conspirator had been destroyed.  These statements, it turned out, were false.  The government had

the documents in its possession, they contained *Brady* material, and the tapes had not been

destroyed.  (Doc. 208 at 10-11).  Once those documents were made available, additional

information harmful to the government's case began to emerge.  For example, it turned out that at

his first interview, after telling an FBI Agent that he had been buying about five kilograms of

cocaine face-to-face from Lyons every two weeks for three years, Mercer had difficulty identifying

him in a photo lineup.  In addition, Mercer was allowed to corroborate his claims of having

purchased drugs from Lyons by testifying that he received a traffic ticket while traveling from St.

Petersburg to Orlando to buy drugs from him.  But in his original interview with the FBI, Mercer

stated he received the ticket while traveling to Martin County to deliver drugs, a statement not

implicating Lyons at all.

On May 22, 2002, the Court granted Lyons' motion for a new trial, issuing a 25-page order,

finding that Assistant U.S. Attorney Hinshelwood had failed to produce exculpatory material and

---

[9]In particular, Mercer implied while on the stand that Lyons was his sole source for cocaine between 1993 and 1996, and made the same statement during interviews shortly before trial. However, during earlier (taped) conversations with a confidential informant, Mercer and his alleged co-conspirator stated that he had several sources, none of whom matched Lyons's description.

had presented testimony that he knew was false, and that such conduct had been prejudicial to

Lyons's defense. (Doc. 208). The new trial was scheduled to commence on July 15, 2002. In the

meantime, Lyons moved for reconsideration of his bond status, which the government continued to

oppose. This Court granted that motion, which would have allowed Lyons to be released on bond.

On June 19, 2002, the government appealed the order granting Lyons a new trial; shortly thereafter,

the government also appealed the order permitting Lyons to be released on bond, contending that

he was a danger to society. (Doc. 237). On July 1, 2002, the United States Court of Appeals for

the Eleventh Circuit granted the government's emergency motion for revocation of bond pending

appeal. (Doc. 239). Lyons would spend another 22 months in jail before being released.

On March 7, 2003, the Court of Appeals reversed this Court's decision to grant Lyons a

new trial. (Doc. 259). Despite finding that the tapes, transcripts, notes and reports concerning

Mercer's testimony contained *Brady* material, the Circuit Court agreed with the government's

contention that the failure to turn it over was not prejudicial to Lyons because of the

"overwhelming" amount of other evidence against him on the drug charge.[10] (Doc. 259 at 10). As

noted above, because of the complete absence of physical evidence against Lyons, the

"overwhelming" amount of evidence referred to by the Court of Appeals consisted entirely of the

---

[10]In a footnote to its opinion, the Court of Appeals – displaying what turned out to be unwarranted deference – said, "We have great doubt that the record would support a conclusion that the prosecutors knew during the trial that [Mercer's] testimony was false or that the prosecutors knowingly failed to correct that testimony." (Doc. 259 at 13 n.3).

testimony of other jail-house snitches who stood to gain Rule 35[11] reductions in their sentences in

exchange for testifying against Lyons.

After prevailing on appeal, the government filed a motion requesting that this Court

schedule sentencing "at the earliest practicable date," making no secret of its intent to push for a

life sentence. (Doc. 262). However, Lyons filed a motion to force the government to disclose all

of the relevant documents as to all of the witnesses against him, arguing that those documents, like

the Mercer documents, likely contained *Brady* material. (Doc. 258).[12] After a hearing, the Court

concluded that it was unlikely that Lyons, in requesting the Mercer documents and tapes, had

happened to stumble upon the one government witness with regard to whom *Brady* material had

been withheld. The Court therefore granted Lyons' motion and ordered the government to produce

various documents relating to these other witnesses for *in camera* review. (Doc. 272).

As set forth in Judge Baker's exhaustive Report and Recommendation of April 23, 2004

(Doc. 300), the government's response to the order was a concerted campaign of delay and denial.

For more than a year, the government brazenly refused to fully comply with the order, repeatedly

failing to produce all of the responsive material or explain the steps that had been taken to find

---

[11]Rule 35 of the Federal Rules of Criminal Procedure permits the Court to reduce a defendant's
sentence, upon the government's motion, where the defendant has provided substantial assistance in
investigating or prosecuting another person.

[12]The Court received an early warning about the impending prosecutorial misconduct in
November 2001, when Lyons's counsel filed a motion (Doc. 77) alleging that Assistant U.S. Attorney
Hinshelwood had been attempting to suborn perjury on the part of one Randall Atwell. According to
Lyons's counsel, Hinshelwood told Atwell he could "walk" on federal drug charges if would testify
against Lyons. (Doc. 77 at 2). Although Atwell repeatedly denied Lyons was involved in the drug
trade, the government kept attempting to convince him to testify in exchange for a reduced sentence.
Subsequently, the Court received correspondence from other inmates disclosing Hinshelwood's efforts
to drum up witnesses against Lyons in exchange for a Rule 35 motion. *See, e.g.,* Doc. 275.

such material, all while certifying complete cooperation. (Doc. 300 at 5-6). The documents that were eventually produced[13] revealed, *inter alia*, that the government had previously failed to turn over many relevant documents, such as documents relating to an earlier (and apparently entirely unproductive) investigation into Lyons's alleged drug dealing. (Doc. 300 at 13-14). The documents also confirmed that the government had, in fact, been promising to file Rule 35 motions in exchange for testimony against Lyons. (Doc. 300 at 11-12). Indeed, the documents revealed that one such witness, Roosevelt Thomas, was allowed to testify that he had not received any deals in exchange for his testimony when he had already received a Rule 35 reduction because of his cooperation in the case against Lyons. (Doc. 300 at 32-33).[14]

Finally, on May 14, 2004, "after reviewing the materials assembled and produced in the course of the extensive proceedings since the remand from the Court of Appeals," the government capitulated and moved to vacate the jury verdict as to the cocaine-trafficking charge. (Doc. 304 at 2-3). The government also announced that it would not seek to retry Lyons on that count, and sought its dismissal. (Doc. 304 at 2). The Court granted the motion, vacating the verdict as to that

---

[13]Many items one would expect to find in the files of a Federal criminal investigation were never turned over to the Court, or the defense. As Judge Baker put it, "the character and number of documents related to this investigation that have gone missing or were never even created in the first instance is remarkable." (Doc. 300 at 11).

[14]Many more such examples could be listed. However, the focus of the instant motion is on Lyons's actual guilt or innocence, and the weight to be given the evidence on that score. In weighing the evidence put forth at trial, it is important to understand the government's extraordinary conduct in investigating and trying Lyons. Because of this, the Court has included some of the details of that conduct in this order. However, that conduct is not, itself, determinative of Lyons's motion, and therefore the Court has not included all of those details here.

count and dismissing it with prejudice.  Ten days later, with the government's consent, Lyons was finally released on bond – 33 months after his arrest.

Lyons then sought dismissal of the remaining charges – carjacking (Count Six) and the sale of counterfeit clothing (Counts Seven to Seventeen).  The government opposed the dismissal but conceded that a time-served sentence would be appropriate.  On September 30, 2004, the Court issued a 31-page order granting Lyons' motion and describing the numerous *Brady* and *Giglio* violations as the work of a "prosecution run amuck."  (Doc. 332 at 17).

## III.    The Instant Motion

Six years after his release, Lyons has returned to this Court, seeking damages for the government's wrongful conduct.  Because prosecutors enjoy absolute immunity from liability in regard to their prosecutorial activities,[15] the only avenue for relief for someone wrongfully convicted and imprisoned for a Federal crime is an action in the Federal Court of Claims, as detailed below.  A prerequisite for such a claim, however, is a certification from the trial court that the defendant is actually innocent of all the charges brought against him.

Lyons made a timely motion (Doc. 348) for such a certificate on December 29, 2009.  The government responded (Doc. 353), and Lyons filed a reply (Doc. 355).  The motion is ripe for determination.

## IV.    The Unjust Conviction Statute

The Unjust Conviction Statute, 28 U.S.C. § 2513, "is a remedial act designed by a fair-minded government as a means of at least partially righting an irreparable wrong done to one of its

---

[15]*See Van de Kamp v. Goldstein*, 129 S.Ct. 855 (2009).

citizens. It has the beneficent purpose of attempting to compensate, as well as money can

compensate for such an injury, the plaintiff for loss of his liberty through an error on the part of his

government." *Osborn v. U.S.*, 322 F.2d 835, 839 (5th Cir. 1963) (quoting *McLean v. U.S.*, 73

F.Supp. 775, 778 (W.D.S.C. 1947)). A limited waiver of the government's sovereign immunity,

the statute authorizes the Court of Claims to award damages to individuals who have been

"unjustly convicted of an offense against the United States and imprisoned." 28 U.S.C. §1495.

The maximum possible award is $50,000 per year of incarceration.[16] 28 U.S.C. § 2513(e).

To recover on such a claim requires more than just a reversal of a previous conviction. The

claimant must either prove that he "did not commit any of the acts charged or his acts . . . did not

constitute an offense against the United States." 28 U.S.C. § 2513(a)(2). In plain terms, he must

prove that he is actually innocent of the charges brought against him. The claimant must also

prove that his prosecution was not caused or brought about by his own misconduct or neglect. 28

U.S.C. §2513(a)(2). Proof of the requisite facts shall be by certificate of the court or pardon

wherein such facts are alleged to appear. 28 U.S.C. §2513(b). The claimant has the burden of

proof of establishing his entitlement to the certificate. *Humphrey v. U.S.*, 52 Fed. Cl. 593, 597

(Fed.Cl. 2002).[17] A proceeding under Section 2513 is civil in nature, and issuance of the certificate

is committed to the sound discretion of the court. *Betts v. U.S.*, 10 F.3d. 1278, 1282-83 (7th Cir.

1993).

---

[16]Individuals who were unjustly sentenced to die may recover up to $100,000 per year of incarceration. 28 U.S.C. § 2513(e).

[17]For a discussion of the Act's legislative history, *see United States v. Keegan*, 71 F.Supp. 623 (S.D.N.Y. 1947).

The legislative history of the Unjust Conviction Statute indicates that Congress did not intend to indemnify every imprisoned person whose conviction has been set aside. *Id.* at 1284 (citing *McLean*, 73 F.Supp. at 778). The case law construing the statute makes it clear that it provides a remedy to be applied in exceptional cases. *U.S. v. Graham*, 595 F.Supp. 681, 684 (S.D. W.V. 2008). This is such a case.

## V. Analysis

In its response to the instant motion, the government admits its own wrongdoing, acknowledging that "the United States's prosecution of Lyons did not reflect the government at its best" (Doc. 353 at 1) and conceding (understatedly) that it committed "serious errors" (Doc. 353 at 16) in that regard. The government tacitly concedes Lyons' actual innocence as to Count One by stating that it is "not relying on the dismissed drug conspiracy count in opposing Lyons's motion." (Doc. 353 at 2, n.1). The government also states that it does not dispute this Court's findings, describing them as having been made "after this Court expended considerable resources to assess the magnitude – and impact – of the government's *Brady* and *Giglio* violations." (Doc. 353, p. 11). In arguing that Lyons is not entitled to the certificate he seeks, the government relies solely on the Paul Brack carjacking charge (Count Six) and the charges that Lyons sold counterfeit goods (Counts Seven through Seventeen).

The requirements of 28 U.S.C. § 2513(a)(1) have clearly been met in this case. After his initial conviction, Lyons has been exonerated as to all the charges against him. Further, it is obvious that Lyons has satisfied the second part of the requirements of 28 U.S.C. § 2513(a)(2), in that he "did not by misconduct or neglect cause or bring about his own prosecution." The government makes a *pro forma* argument to the contrary, stating that the prosecution on the

carjacking and counterfeit goods charges resulted from Lyons's misconduct – *i.e.*, yanking Brack out of his car, and selling mislabeled clothes.

Case law on this portion of Section 2513 is sparse. But the legislative history of the statute shows that, to be disqualifying, the misconduct must consist of something outside of the charged conduct, such as "an attempt to flee, a false confession, the removal of evidence, or an attempt to induce a witness or an expert to give false testimony or opinion, or an analogous attempt to suppress such testimony or opinion." *Keegan*, 71 F.Supp. at 638 (quoting Edwin M. Borchard, "State Indemnity For Errors of Criminal Justice"). *See also Betts*, 10 F.3d at 1284-85 (finding that prosecution of attorney, who had been convicted of contempt for failing to attend hearing, had not been brought about by his failure to appear). In the words of the *Betts* court, a defendant who has the ability to avoid prosecution but instead acts in such a way as to insure it is responsible for the prosecution and deserves no compensation. *Id.* at 1285. The government has not alleged that Lyons did anything "extra," beyond the charged conduct, that led to his prosecution.

Thus, the issue of Lyons's entitlement to the certificate he seeks boils down to whether he is actually innocent of the carjacking charge set forth in Count Six and the counterfeit goods charges set forth in Counts Seven through Seventeen.

### A. The Carjacking

A series of events at a Hampton Inn on the night of June 14, 1998 led to the filing of two carjacking charges and a weapons charge against Lyons. The jury acquitted Lyons as to the weapons charge and one of the carjacking charges. However, he was convicted of Count Six – the Brack carjacking.

The facts concerning this incident are largely undisputed. While at the Hampton Inn, Lyons was robbed of a large sum of money. Afterward, he ran outside to try to catch the man who had robbed him. At the hotel's entrance, he saw Brack, sitting in a car. Lyons concluded, incorrectly, that Brack was the robber's getaway driver. Lyons then grabbed Brack, allegedly telling him to give him the keys or he would blow his head off. After Brack complied, Lyons turned him over to nearby spectators, telling them to hold him and call the police. He then drove off in Brack's car to pursue the robber.[18]

The pertinent statute, 18 U.S.C. § 2119, makes it a federal crime to take a motor vehicle "from the person or presence of another by force and violence or by intimidation," so long as the taking is done "with the intent to cause death or serious bodily harm." Thus, to violate the statute, at the moment the defendant demanded or took control over the vehicle, the defendant must have possessed the intent to seriously harm or kill the driver if necessary to steal the car. After the trial in this matter, the Court denied Lyons's motion for a judgment of acquittal on Count Six, finding that "the jury could well have concluded that Mr. Lyons would have harmed Mr. Brack had he not complied with Defendant's demand." (Doc. 138 at 6).

Of course, as has since become clear, that order and the underlying verdict were rendered after 20-odd felons took the witness stand and testified that they had personal knowledge that Lyons was a major (and violent) drug trafficker. Among the witnesses making these claims was

---

[18]Shortly thereafter, Lyons tried to commandeer another vehicle from Gloria Barton Western, who was parked in a nearby lot. According to her testimony, Lyons told her that he had an emergency and was not trying to steal her car. When she resisted, he gave up trying to take the vehicle. Lyons's effort to take Western's car resulted in the second carjacking charge (Count Five), of which the jury acquitted him.

Jeanty Jacques, who was in the hotel room with Lyons when the robbery occurred.  In fact, Jacques

testified, the robbery was a setup, and he was the one who had set it up.[19]  (Doc. 332 at 10).

Jacques told the jury that Lyons was both armed and violent on the night of the robbery,

going so far as to threaten Jacques at gunpoint.  When asked if he was looking for a sentence

reduction for his testimony, Jacques denied even discussing that possibility with the government,

saying he was testifying against Lyons solely because Lyons had pulled a gun on him.  He then told

the jury, "I ain't looking for no sentence reduction."  (Doc. 332 at 16).  Jacques's statement

contained a grain of truth, because he had no reason to keep looking.  Assistant U.S. Attorney

Hinshelwood had already filed a Rule 35 motion on his behalf – under seal, where it could not be

discovered by Lyons's counsel.  (Doc. 67, under seal, in *U.S. v. Jacques*, Case No. 98-6103-Cr-

Seitz (S.D. Fla.)).  That same document made it clear that an AUSA in Miami had already

discussed the motion with Jacques's attorney.[20]

It is not surprising then that the jury convicted Lyons of this charge.  In upholding this

conviction, the Court found it to be a close call, but in light of the evidence as it stood at that point,

the verdict was sustainable.  Now it is not.  The revelations since the Court ruled against Lyons on

---

[19]Jacques testified that he had lured Lyons to the Hampton Inn for a drug deal, arranging for one person (Karlis Fenelus) to accompany him in the room and another (David Sejour) to invade the room and rob Lyons.  Fenelus and Lyons both testified that, rather than a drug deal, Lyons thought he was there to pay for a band that was going to give a concert at Lyons' club that evening.  Sejour, a close friend of Jacques, testified that he was not aware that the robbery had anything to do with drugs.

[20]It is also worth nothing that, at 6:07 p.m. on the day Jacques testified in this case, AUSA Hinshelwood emailed the AUSA in Miami to "please do what you can do" for Jacques, opining that a 50 percent sentence reduction would be appropriate.

his motion for a new trial have fatally undermined the evidence on which the jury must have relied

to reach its verdict.

To prevail on this motion, however, Lyons must go beyond undermining the verdict and

demonstrate that he is actually innocent of the charges. To that end, this Court must re-examine all

of the evidence, including Lyons's testimony, untainted by the false testimony at trial.

In light of the Court's earlier findings, and what has since become known, the Court finds

that what had been a close question now tilts in Lyons's favor. Lyons was not armed.[21] He had

just been robbed. His belief that Brack was the getaway driver, and his conduct in handing him

over to bystanders with instructions to call the police, are simply inconsistent with the intent

required to constitute this crime. The Court therefore finds by a preponderance of the evidence that

Lyons did not take Brack's car with "intent to cause death or serious bodily harm" and is therefore

innocent of the charge of violating 18 U.S.C. § 2119.

### B.     Sale of Counterfeit Goods

Counts Seven through Seventeen of the Second Superceding Indictment charged Lyons

with trafficking in counterfeit merchandise at his clothing stores in violation of 18 U.S.C. § 2320.[22]

To establish a violation of that statute, the government must show that the defendant knowingly

---

[21]There is no credible evidence that Lyons was armed. Brack did not see a weapon, and the jury acquitted Lyons of the related weapons charge (Count Four).

[22]The counterfeit clothing charges, if proven, would likely have produced only a probationary sentence with no jail time. However, the modest case law on this issue suggests that relief is not available under the Unjust Conviction Statute if *any* of the charges against Defendant are valid, even if those charges are relatively minor and played no role in Defendant's incarceration. It should also be noted that if Lyons had been charged only with selling counterfeit goods, it is a near certainty that he would have been allowed to remain free on bond after his arrest, pending trial.

used a counterfeit mark on the goods, or knew that such a mark had been applied to them. 18 U.S.C. § 2320(a)(1).

In support of these charges, the government called witnesses who had made undercover purchases at Lyons's store over a seven-month period and experts who testified that the purchased goods were not genuine. There was no direct evidence that Lyons knew the goods were counterfeit.[23] To the contrary, Lyons testified that he had purchased the merchandise as overstock items from established retailers without knowing that they were not authentic. Thus, the verdicts on these counts were necessarily based on circumstantial evidence – Lyons's possession and sale of counterfeit goods, plus an inference from the totality of the evidence that he knew they were fakes.

In his closing argument, AUSA Hinshelwood made it clear that the jury's conclusion as to the counterfeit goods charges should rest on the testimony put forth in regard to the drug-conspiracy count. If the jury believed even a single one of the twenty-odd government witnesses who claimed Lyons was a drug dealer, that meant Lyons had not been telling the truth.

> And if he's lying, then if follows from that he's been dealing drugs, as set out in Count One. He was attempting to get drugs from Mr. Jacques on June 14th, as set out in Count Three. He used guns to do that, as set out in Count Four. He did a . . . committed a carjacking in the aftermath of that. And, in all likelihood, this series of transactions over a six-month period was far from an isolated mistake, but constituted a pattern of trafficking in counterfeit merchandise.

(Trial transcript at 2463-64).

It has now been established (and the government tacitly concedes) that when Lyons denied dealing in illegal drugs, he was telling the truth. With that, the evidentiary predicate on which the

---

[23]Apparently, the fakes were convincing. The agents sent to Lyons's store to buy counterfeit goods also ended up with legitimate goods. At trial, the government brought in expert witnesses to establish to the jury that the goods were not authentic.

jury based its verdict is no longer viable. As noted in the Court's order dismissing these counts, "Had Lyons's credibility not been denigrated by tainted evidence, there is a reasonable probability that the jury could have found that Lyons made legitimate mistakes." (Doc. 332 at 22).

Again, however, for present purposes, lack of confidence in the jury's verdict is not enough. Rather, the Court must now look at the evidence afresh and decide whether Lyons was actually innocent of these charges.

Given the burden of proof and nature of a criminal trial, the record is not conducive to certainty on this point. We know that some of the goods sold by Lyons were counterfeit. Aside from the fact of those sales, the only evidence of intent is Lyons's denial. However, there is no longer any basis to impeach Lyons's testimony in this regard. Therefore, the Court credits Lyons' testimony and finds that Lyons lacked the knowledge and intent necessary to violate 18 U.S.C. § 2320. The Court concludes therefore that Lyons is actually innocent of Counts Seven through Seventeen.

## VI.    Conclusion and Certification of Actual Innocence

Based on the foregoing, the Court concludes that Lyons has satisfied the requirements of 28 U.S.C. § 2513 and may bring a claim under 28 U.S.C. § 1495 because he is actually innocent of the charges brought against him in this case.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on July 20, 2010.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
ANTONINO EUGENE LYONS
A/k/a Nino